UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-23024

CIV-GRAHAM

/ TORRES

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

Securities and Exchange Commission v. Pimstein et al

ANDRES L. PIMSTEIN, THE BOTTOM LINE OF
SOUTH FLORIDA, INC., and SUMMIT TRADING LLC,

Defendants.

Doc. 1

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges as follows:

### INTRODUCTION

1. From at least 2005 through April 2008, Defendant Andres L. Pimstein carried out a multi-million dollar Ponzi scheme using two corporate entities, Defendants The Bottom Line of South Florida, Inc. and Summit Trading LLC. Defendants, directly and through others, offered and sold more than $30 million of securities to investors, purportedly to finance an export business they claimed operated through Bottom Line and Summit Trading. Defendants represented to investors the companies purchased millions of dollars worth of iPods, laptops, and miscellaneous personal electronics from vendors in the United States, and sold them for a substantial profit to a Chilean company that operates one of the largest department store chains in South America.

2. Contrary to Defendants' representations, they made very few electronics purchases and did not sell any electronics to the Chilean company. Instead, Defendants ran a Ponzi scheme where they fraudulently used most of the funds they raised to pay

principal and interest to existing investors, and to pay commissions to several individuals who solicited investors on their behalf. Pimstein also used investors' funds to pay his personal expenses. Notably, Pimstein has admitted there were no sales of electronics to the Chilean company and that he operated a Ponzi scheme.

3. By engaging in this conduct, Pimstein, Bottom Line and Summit Trading violated, and, unless enjoined, are likely to continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §77a(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5.

## DEFENDANTS

4. Pimstein, 48, is a citizen of Chile and a lawful permanent resident of the United States. Since at least 2005, he resided in Miami, Florida.

5. Bottom Line is a Florida corporation formed in September 1988 and had its principal place of business in Homestead and Miami, Florida. At all times relevant to the allegations of this Complaint, Pimstein was a director and partial owner of Bottom Line.

6. Summit Trading is a Florida limited liability company formed in March 2005 and had its principal place of business in Miami, Florida. At all times relevant to the allegations of this Complaint, Pimstein held himself out to investors as an owner or a principal of Summit Trading.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

8. The Court has personal jurisdiction over Defendants and venue is proper in the Southern District of Florida. Pimstein resides in the Southern District of Florida and Bottom Line and Summit Trading have their principal places of business in the Southern District of Florida. Defendants also undertook numerous acts in the Southern District of Florida that constitute the fraud set forth in this Complaint.

9. Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and course of business set forth in this Complaint.

## DEFENDANTS' OFFERING SCHEME

10. From at least 2005 to April 2008, Defendants offered and sold securities to approximately eighty investors in at least five states to purportedly fund an export business that Pimstein and others operated through Bottom Line and Summit Trading.

11. Initially, Pimstein solicited funds from his friends and acquaintances. As his alleged business grew, however, Pimstein paid several investors (the "Agents") commissions to solicit new investors on his behalf. The Agents oftentimes solicited their families, friends and acquaintances.

12. Pimstein and the Agents conducted meetings with individual investors and in groups where they told investors that Bottom Line and Summit Trading sold iPods, laptop computers, and miscellaneous personal electronics to Ripley Corp., S.A., a Chilean company that operates one of the largest department store chains in South America. They also informed investors that Bottom Line and Summit Trading purchased the electronics they sold to Ripley from vendors in the United States.

13. Pimstein and the Agents told investors that Bottom Line and Summit Trading generated substantial profits from the sales they made to Ripley. They claimed the arrangement was lucrative for two reasons.

14. First, Pimstein and the Agents represented that Ripley was willing to buy electronics from Bottom Line and Summit Trading at above-market prices in order to supplement the product allocations it received from manufacturers, which were insufficient to meet local customer demand.

15. Second, Pimstein and the Agents represented that Bottom Line and Summit Trading had a competitive edge over other electronics suppliers because Pimstein was the cousin of Ripley's Chief Executive Officer, and Ripley had employed him for nearly five years as its General Merchandise Director responsible for the company's purchasing function.

16. In reality, Defendants did not make any sizeable electronic purchases and Ripley did not buy any electronics from Defendants. Defendants also did not enjoy the competitive edge Pimstein claimed. He was merely a distant cousin of Ripley's CEO, and while Ripley had employed Pimstein, he was only employed as an area manager responsible for purchasing adult clothing, shoes and sports equipment.

17.     To raise capital for the purported export operations of Bottom Line and Summit Trading, Pimstein and the Agents sold investors securities in the form of promissory notes and investment contracts in Bottom Line and Summit Trading, and in several other companies the Agents formed to fund Bottom Line and Summit Trading. The promissory notes and investment contracts paid fixed annual interest rates, typically between 18% and 36%, and Pimstein and the Agents remitted funds to investors on a monthly basis. Pimstein and the Agents told investors they could request the return of their funds at any time, usually with sixty days written notice. However, most investors opted to reinvest the funds they received because of the exceptionally high interest rates.

18.     Defendants engaged in the offer and sale of securities because, among other reasons, they offered and sold notes or investment contracts. The securities were notes because: (1) investors expected to profit from their investment; (2) they were widely distributed to at least eighty investors in five states; and (3) Defendants, Agents and investors often referred to the notes as investments or securities.

19.     The securities were investment contracts because the investors' expected profits were premised on Defendants' purported efforts to generate profits by selling electronics to Ripley. Defendants' scheme involved investors making an investment of money in a common venture premised on a reasonable expectation of profits derived from Defendants' efforts. Additionally: investors were subject to financial loss if Defendants' businesses failed; Defendants pooled investors' funds; and investors' gains or returns were wholly dependent on the efforts of Defendants and other third-parties to generate a successful business.

20. At least two of the Agents, conducting business as SVDB LLC f/k/a SVDB, Inc. ("SVDB"), with its principal place of business in Coral Gables, Florida, and HiFi Capital LLC ("HiFi"), distributed offering materials to investors and required them to complete subscription agreements and accreditation questionnaires. The offering documents described the securities offered and sold, and incorporated many of the oral misrepresentations Pimstein made.

21. From at least February 2006 to April 2008, SVDB raised capital for Pimstein and Bottom Line by making very similar misrepresentations Pimstein and Bottom Line were making to investors, such as that the money raised would go towards financing the purchase and resale of electronics to Ripley.

22. From at least February 2006 through September 2007, the misrepresentations made by SVDB were based on information provided by Pimstein and others were oral. However, beginning in October 2007, SVDB provided investors with a private placement memorandum ("PPM") and written business plan dated October 30, 2007 that offered $15 million in debt securities and memorialized many of the misrepresentations made by Pimstein and others. For example, the PPM represented that SVDB would use the "working capital" it raised from investors to finance "the purchase of wholesale electronics and miscellaneous products by The Bottom Line of South Florida, Inc., a purchasing agent for the Ripley Department Store Chain in both South American Countries of Chile and Peru."

23. From at least December 2006 to April 2008, HiFi raised capital for Summit Trading by issuing its investors promissory notes. HiFi provided investors with an undated 44-page offering package that included, among other things, appendices

describing HiFi's business and Summit Trading's background ("Offering Package"). The Offering Package gave investors the opportunity to purchase promissory notes in $10,000 increments.

24. The Offering Package stated HiFi was formed "for the purpose of providing inventory and receivable financing to Summit Trading LLC," which it described as "a Florida-based exporter of computer and electronic products." The Offering Package identified Pimstein as Summit Trading's "co-founder and Director of Business Development." It also falsely stated that Pimstein, in 1983-84, "assumed the position of General Merchandise Director for Commercial ECCSA, better known as Ripley, owned by Andy's first cousins and among the top three largest full-line department store chains in all of South America" and "[d]uring his five year tenure as General Merchandise Director, Andy was responsible for the entire [Ripley] purchasing function."

25. The Offering Package claimed that Pimstein and another person, purportedly developed Summit Trading's business, which was to purportedly source, within the United States, high-end, brand name electronic equipment for Ripley. It further depicted HiFi's relationship with Summit Trading and Summit Trading's relationship with Ripley as follows:

> Summit Trading receives purchase orders from Ripley and procures products (mostly consumer electronics such as iPods and laptops) from distributors in the United States using its own funds as well as inventory and accounts receivables financing provided (and/or to be provided) by HiFi Capital and other lenders or investors. Summit Trading ships such products to Miami, Florida where they are turned over to Ripley's freight forwarder and becomes the property of Ripley at that point. . . . Summit Trading then invoices Ripley's Account Payable Department, and an account receivable is generated by, and recorded in the books of Summit Trading.

The Offering Package further explained that "[u]pon receipt of payments from Ripley for goods sold, Summit Trading will repay the amount funded by HiFi Capital plus an agreed-upon return."

26. In addition, the Offering Package represented that through October 2006, Summit Trading had purportedly achieved sales of $46.6 million, and during 2005 had gross sales of $15.9 million.

27. Pimstein and Summit Trading knew HiFi was offering and selling securities to raise money for them. Pimstein often called HiFi's principal asking him for more investors' funds and to discuss the rate of return paid to investors. Pimstein also called or emailed the principal to congratulate when an investor contributed a substantial amount of money. Furthermore, during the latter part of 2006, Pimstein and others pitched investors in the principal's New Jersey home. During this pitch, Pimstein and others spoke to potential investors about investing in Summit Trading; about Summit Trading's purported business of selling electronics to Ripley at a guaranteed profit; Pimstein supposedly being previously employed to oversee the entire purchasing function for Ripley; and about investors receiving specific rates of return for their investments.

28. Between 2005 and April 2008, Defendants and the Agents fraudulently raised more than $30 million from investors through the aforementioned sales efforts and misrepresentations. During this time, Defendants received ill-gotten gains. Pimstein used some of these ill-gotten gains for personal expenses, such as payments toward his home and automobile, and child support and alimony payments.

## DEFENDANTS' MISREPRESENTATIONS AND THE COLLAPSE OF THEIR SCHEME

29. From at least 2005 to April 2008, Defendants operated a large Ponzi scheme by using newly invested funds to make principal and interest payments to existing investors.

30. Contrary to Defendants' representations, Pimstein, Bottom Line and Summit Trading never sold iPods, laptop computers, or other electronics to Ripley. In addition, Summit Trading did not achieve sales of $46.6 million through October 2006, and during 2005 did not have gross sales of $15.9 million as stated in the Offering Materials. Rather, between 2005 and April 2008, Ripley only purchased $10,000 worth of women's pajamas and accessories and did not purchase any electronics from Defendants. Moreover, Defendants only sold a relatively small amount of electronics to a Miami, Florida merchant. These small purchases simply do not justify the claim that Summit Trading had gross sales in the tens of millions of dollars, as the Offering Materials claimed.

31. Defendants' representations that Bottom Line and Summit Trading were using investors' funds to buy electronics for resale to Ripley were also false. From 2005 to April 2008, Defendants purchased a relatively small quantity of iPods and sold them at a loss on consignment to the Miami, Florida merchant. Defendants did not sell any electronics to Ripley. In addition, one of Pimstein's primary duties for Bottom Line and Summit Trading was to purchase electronics for resale. Consequently, Pimstein knew, or was extremely reckless in not knowing, that Defendants were not purchasing large quantities of electronics.

32. Pimstein, Bottom Line and Summit Trading used a majority of the funds they raised from investors to pay interest and principal to existing investors and commissions to the Agents. Pimstein also used the funds to pay his personal expenses.

33. In April 2008, the interest and principal Bottom Line and Summit were obligated to pay investors substantially exceeded the amount of new funds Pimstein and the Agents were able to raise from investors.

## PIMSTEIN'S ADMISSIONS

34. On April 17, 2008, Pimstein answered questions in an interview conducted by the Miami Dade Police Department. During the interview, Pimstein admitted, among other things, that Bottom Line and Summit Trading had not generated any profits from the sale of electronics and that he had used investors' funds to make interest payments to investors.

35. On April 19, 2008, Pimstein appeared for a video deposition conducted by a private attorney. During the deposition, Pimstein admitted, among other things, that Ripley had never purchased any electronics from Defendants. He also admitted to operating a Ponzi scheme by using most of the funds raised from investors to pay interest and principal to existing investors.

## COUNT 1

## Fraud in Violation of Section 17(a)(1) of the Securities Act

36. The Commission repeats and realleges Paragraphs 1 through 35 of this Complaint as if fully set forth herein.

37. From at least 2005 to April 2008, Pimstein, Bottom Line and Summit Trading, directly and indirectly, by use of the means or instruments of transportation or

communication in intestate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully, or recklessly employed devices, schemes, or artifices to defraud.

38. By reason of the foregoing, Pimstein, Bottom Line and Summit Trading, directly or indirectly, violated and, unless enjoined, are likely to continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### Fraud in Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act

39. The Commission repeats and realleges Paragraphs 1 through 35 of this Complaint as if fully set forth herein.

40. From at least 2005 to April 2008, Pimstein, Bottom Line and Summit Trading directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this Complaint: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

41. By reason of the foregoing, Pimstein, Bottom Line and Summit Trading, directly or indirectly, violated and, unless enjoined, are likely to continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3).

11

## COUNT III

### Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-5

43. The Commission repeats and realleges Paragraphs 1 through 35 of this complaint as if fully set forth herein.

44. From at least 2005 to April 2008, Pimstein, Bottom Line, and Summit Trading, directly or indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the purchase or sale of securities, as described in this Complaint, knowingly, willfully or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which have operated or would operate as a fraud upon the purchasers of such securities.

42. By reason of the foregoing, Pimstein, Bottom Line and Summit Trading, directly or indirectly, violated and, unless enjoined, are likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests the Court:

### Declaratory Relief

Declare, determine, and find that Pimstein, Bottom Line and Summit Trading committed the violations of the federal securities laws alleged in this complaint.

### Permanent Injunction

Issue a Permanent Injunction, enjoining Pimstein, Bottom Line, and Summit Trading, their agents, servants, employees, attorneys, and representatives, and all persons in active concert or participation with them, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

### Accounting

Order a sworn accounting by Pimstein, Bottom Line and Summit Trading of all money, property and other assets they derived, directly or indirectly, from their unlawful activities.

### Disgorgement with Prejudgment Interest

Issue an Order directing Pimstein, Bottom Line and Summit Trading to each disgorge all profits or proceeds they received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

### Civil Money Penalty

Issue an Order directing Pimstein, Bottom Line and Summit Trading to each pay a civil money penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

October 30, 2008

Respectfully submitted,

By: *Christopher E. Martin*
Christopher E. Martin
Senior Trial Counsel
martinc@sec.gov
S.D. Fla. Bar No. A5500747
Direct Dial No.: (305) 982-6386
Facsimile No.: (305) 536-4154

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone No.: (305) 982-6300
Facsimile No.: (305) 536-4154

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**08-23024**

### I. (a) PLAINTIFFS
Securities and Exchange Commission

### DEFENDANTS
Andres L. Pimstein, The Bottom Line of South Florida, Inc., and Summit Trading LLC

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**CIV-GRAHAM**

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Securities and Exchange Commission
Christopher E. Martin, Esq. (305) 982-6386
801 Brickell Ave., Suite 1800, Miami, FL 33131

Attorneys (If Known)
See Attached

/TORRES

**(d)** Check County Where Action Arose: ✓ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

DADE-08-23024-CIV-GRAHAM-TORRES

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

✓ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 365 Personal Injury - Product Liability |  | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|  |  | ☐ 660 Occupational Safety/Health |  | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 690 Other |  | ☐ 810 Selective Service |
|  | ☐ 370 Other Fraud |  |  | ☒ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** |  |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** |  | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land |  | ☐ 530 General |  |  |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other |  |  |  |
|  | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights |  |  | ☐ 950 Constitutionality of State Statutes |
|  | / ☐ 555 Prison Condition |  |  |  |
|  | ☐ 440 Other Civil Rights |  |  |  |

### V. ORIGIN (Place an "X" in One Box Only)

✓ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ✓ NO     b) Related Cases ☐ YES ✓ NO

JUDGE _____   DOCKET NUMBER _____

### VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

15 U.S.C. § 77q; 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. Violations of the federal securities laws.

LENGTH OF TRIAL via __7__ days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ Perm. Inj., Disgorgement, Penalties
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ✓ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD   DATE 10/30/08

**FOR OFFICE USE ONLY**
AMOUNT _____   RECEIPT # _____   IFP _____

FEE WAIVED

## Attorneys (If known)

Alberto F. Sarasua, Esq.
442 Hampton Lane
Key Biscayne, FL 33149
Telephone: (305) 361-7480
Email: afsarasuakiko@yahoo.com
*Counsel for Andres L. Pimstein and*
*The Bottom Line of South Florida, Inc.*

Allan M. Lerner, Esq.
Law Offices of Allan M. Lerner, PA
2888 East Oakland Park Blvd.
Ft. Lauderdale, FL 33306
Telephone: (954) 563-8111
Facsimile: (954) 563-8522
Email: AMLRWP@aol.com
*Counsel for Summit Trading LLC*